DAHL, Appellant, v. HOUSING AUTHORITY OF THE CITY OF
MADISON, Respondent.

*No. 160.   Argued January 31, 1972.—Decided February 29, 1972.*
(Also reported in 194 N. W. 2d 618.)

For the appellant there were briefs and oral argument by *Vernon Molbreak* of Madison.

For the respondent there was a brief by *Edwin Conrad,* city attorney, and *William A. Jansen,* principal assistant city attorney, and oral argument by *Mr. Jansen.*

A brief amicus curiae was filed by *Charles D. Hoornstra* of Madison, for the Wisconsin Chapter, the Associated General Contractors of America, Inc.

ROBERT W. HANSEN, J. Two issues, and two issues only, are raised on this appeal. The first relates to the contractor's claim to $12,120 for removal of peat and backfill with sand under certain footings in the construction project. The second involves the right of the contractor to interest on sums ordered paid in the judgment. Each will be taken up in turn.

*Removal and backfill claim.*

At construction site "C," one of four covered by the contract, a construction problem was presented by the presence of peat soil under the footings of the proposed construction. This fact was known to the Housing Au-

thority and to its architect.[1] While the architect's plan drawings show the footings of the foundation at site "C" to be two to five feet above the layer of peat, no provision for meeting the problem presented was made on the plans. However, Division 2 (10) of the specifications sets forth:

". . . On Site 'C,' soil investigation indicates a layer of peat. Where footings and foundations occur in this material or immediately above, remove the peat to its full depth and fill with granular material and compact to 95% compaction . . . ."

No additional compensation to the contractor is suggested or provided for such removal and backfilling operation. Another section of the specifications, Division 3 (7), provides:

". . . All footings to rest on undisturbed soil. If necessary, foundations may be required to greater depths than shown. If work is ordered by Local Authority, its cost will be determined on basis of unit prices established in the Special Conditions."

Additionally, there is in the specifications General Condition 10 (g) providing:

"g. During the progress of the work, if the Contractor encounters at the site (1) subsurface or latent physical conditions differing materially from those indicated in the Contract or (2) unknown physical conditions differing materially from those inhering in work of the character provided for in this Contract, he shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing. . . . The Contracting Officer shall thereupon promptly investigate such conditions and if he finds that they do materially differ he shall cause such changes to be made in the Specifications

[1] Warzyn Engineering Company, retained by the Housing Authority to make a soil survey, made soil borings and, as to site "C," recommended that the footings be placed below the level of the peat or that the peat be removed if footings were placed at a higher level.

and Drawings as he may deem necessary, if any, and shall make such equitable adjustment in the contract price or time as is justified . . . ."

Shortly after the awarding of the contract, the digging of a utility trench at site "C" revealed that the soil, due to the layer of peat, would not bear the footings. Treating this situation as an ". . . unknown physical condition differing materially from those inhering in work of the character provided for in this Contract, . . ." the contractor wrote a letter to the Housing Authority outlining the problem and requesting determination by the Authority as to the procedure to be followed. The Housing Authority responded that Division 2 (10) of the specifications required the removal of the peat under the footing and backfilling with sand by the contractor without additional compensation. At a meeting of contractor, Authority and architect, the contractor was directed to remove the peat and backfill with compacted sand. On the day of the meeting, the contractor sent the Housing Authority a formal notice of dispute, contending that the removal and backfill was beyond the scope of the contract and specifications, and demanding additional compensation.[2]

So, very early in the ball game, not only the fact of dispute but the exact position of each disputant became clear. At the first meeting on the dispute, as later before the trial court and now before us, the contractor contends that the peat at site "C" was an "unknown physical condition" governed by General Condition 10 (g) of the specifications for the removal of which he is entitled to extra compensation. Now, as then, the Housing Authori-

---

[2] Not involved on this appeal is the excavating and backfilling under the slab of the building. The Housing Authority did issue a proceed order for $11,828.90 for such excavating and backfilling. No allowance was made for additional compensation for the work involved under the footings of the building, the contention being that this was covered by Division 2 (10) of the specifications.

ty contends that the peat layer under the footings was a condition covered by the contract and governed by Division 2 (10) of the specifications, and no additional payment due for its removal and the backfilling. The trial court agreed with the Authority finding that the removal and backfilling was ". . . work which plaintiff was required to do under the terms of the contract."

The conclusion of law reached by the trial court necessarily rests upon a finding of fact that the footings two or more feet above the layer of peat were "immediately above" such footings or foundation. Urging a "nothing intervenes" definition of the term, "immediately above," the contractor cites a case defining "immediately" to mean that " 'it forbids the existence of intervening space.' " [3] The Housing Authority urges a broader definition of the word "immediately," citing a case holding it to mean only " 'Being near at hand; not far apart or distant.' " [4] One accepted dictionary defines "immediate" to mean: ". . . 4: characterized by contiguity: existing without intervening space or substance . . . *broadly:* being near at hand: not far apart or distant . . ." [5] However, we do not view the reference here to "immediately above" as a matter of choosing between dictionary or judicial definitions.[6] An airplane a few hundred feet over an airport may well be "immediately above" the landing place. Whether footings two feet above a peat layer are "immediately above" it is to be

[3] *See: Roach v. Soles* (D. C. Cal. 1954), 120 Fed. Supp. 400, 404.

[4] *See: People v. Bauer* (1966), 241 Cal. App. 2d 632, 642, 50 Cal. Rptr. 687.

[5] Webster's New International Dictionary (3d ed., unabridged), page 1129.

[6] If it were no more than a choice between various meanings that can be given a term, the term would have to be strictly construed against the draftsman of the contract, here the Housing Authority. *See: North Gate Corp. v. National Food Stores* (1966), 30 Wis. 2d 317, 322, 140 N. W. 2d 744.

answered in the light of the specific situation, specific circumstances and specific reference in the specifications. The term is ambiguous and evidence of the surrounding circumstances can be considered in construing the term or determining its applicability.[7] Since the language used in the specifications is reasonably susceptible to different constructions, the sense in which the words are therein used becomes a question of fact.[8]

The trial court's holding that ". . . the plaintiff was required to remove the fill dirt in question in accordance with the terms of the contract" is not to be reversed unless it is contrary to the great weight and preponderance of the evidence.[9] Given the nature of this construction project, the type of buildings involved and the terms of the contract and specifications, we cannot and do not find the trial court finding and conclusion contrary to the great weight of the evidence. We are aided in affirming by the obvious fact that Division 2 (10) of the specifications, while general in application, makes specific reference to site "C" and to the presence of peat soil at such site. The contract requirement that ". . . Where footings and foundations occur in this material [peat soil] or immediately above," the contractor is required to "remove the peat to its full depth and fill with granular material and compact to 95% compaction. . ." follows immediately the statement and warning: "On Site 'C,' soil investigation indicates a layer of peat." Particularly where the peat soil problem was encountered at the exact site where Division 2 (10) stated it might or would be, the provision in Division 2 (10) as to how the latent soil problem was to be handled—by the con-

[7] *Hope Acres, Inc. v. Harris* (1965), 27 Wis. 2d 285, 291, 134 N. W. 2d 462, 135 N. W. 2d 775.

[8] *Lemke v. Larsen Co.* (1967), 35 Wis. 2d 427, 432, 151 N. W. 2d 17.

[9] *Williams v. Rank & Son Buick, Inc.* (1969), 44 Wis. 2d 239, 242, 170 N. W. 2d 807.

tractor, without additional compensation—applies. At least, it is not a fact finding by the trier of fact which can be held to be against the great weight and preponderance of the evidence.

*Question of interest.*

On appeal the issue is raised by the plaintiff-appellant contractor as to his entitlement to interest on claims allowed by the trial court for work done under the contract or changes in the work authorized by the Housing Authority.[10] Striking the four claims entirely disallowed by the trial court, including the claims for extra compensation for the removal of peat and sand backfill under footings at site "C," the amounts claimed and the amounts allowed by the trial court on such claims are (numbered for ease of reference) as follows:

| Item | Claim | Award |
|------|-------|-------|
| 1. Outriggers (overhang supports) | $ 3,650.43 | $ 3,650.43 |
| 2. Add texture to paint | 3,500.00 | 1,600.00 |
| 3. Additional design layout | 2,000.00 | 2,012.08 |
| 4. Concrete benches | 500.00 | 500.00 |
| 5. Landscaping | 5,363.50 | 5,363.50 |
| 6. Noncompliant window priming | 3,000.00 | 3,000.00 |
| 7. Paint exterior grilles | 750.00 | 450.00 |
| 8. Door closers | 400.00 | 40.00 |
| 9. Noncompliant job offices | 1,500.00 | 1,500.00 |
| 10. Overrun in contract time | 11,658.00 | 11,658.00 |
| 11. Change Order G–10 | 11,828.90 | 11,828.90 |
| 12. Change Order G–15 | 1,051.20 | 629.55 |

[10] As to contract or order changes, the trial court found: ". . . that at no time did the plaintiff make any change without authorization or direction by the defendant. . . . The contract, in the court's opinion, authorized changes in the work by the local authority, and the defendant is obligated to pay to the plaintiff under its contracts the sums as hereinafter determined. . . ."

The trial court denied interest on all claims for amounts due under the contract, including those allowed in full, for the reason that "there is a genuine dispute about the amounts due the plaintiff." Both the denial, and the reason or basis for denial, require examination.

This court has long sought to steer between Scylla and Charybdis in determining whether and when interest is to be payable on a contract claim brought to court. The Scylla is the danger of encouraging plaintiffs to overstate claims as a bargaining device for pretrial negotiations. The Charybdis is the danger of encouraging defendants to understate liability on clearly due and payable claims in order to create a bargaining leverage as to such claims or as to other claims made. If all that is required is the fact of dispute or disagreement as to amount due, it is obvious that the effort has been unrewarding, and the mere fact of the amount being disputed would take away the right to interest, even as to items clearly established by trial proceedings to have been entirely due and clearly payable without resort to litigation.

The question of when interest is to be payable and when it is not to be required in contract cases has been given extensive consideration in Wisconsin cases. Both the problems presented and the approach to be taken were outlined in an early case, *Laycock v. Parker,*[11] holding:

". . . The true principle, which is based on the sense of justice in the business community and on our statute, is that he who retains money which he ought to pay to another should be charged interest upon it. The difficulty is that it cannot well be said one ought to pay money, unless he can ascertain how much he ought to pay with reasonable exactness. Mere difference of opinion as to amount is, however, no more a reason to excuse him from interest than difference of opinion whether he legally ought to pay at all, which has never been held

[11] (1899), 103 Wis. 161, 79 N. W. 327.

an excuse. . . . So, if there be a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he owes, he should equally be held responsible for making such application correctly and liable for interest if he does not. . . ." [12]

Rejecting dispute or difference of opinion as to amount as a reason for excusing one from paying prejudgment interest, the *Laycock Case* makes the test: Is there "a reasonably certain standard of measurement" by the correct application of which one can ascertain the amount he owes. This test has been phrased to read: ". . . entitled to recover such interest on all such items of damage from the time that the probable pecuniary amount or money value thereof could have been computed . . . to a reasonable certainty . . . ." [13] And, meaning unaltered, more recently stated as: ". . . before interest can be recovered the amount claimed must be fixed or determined or readily determinable. . . ." [14] The question of whether damages in a particular case are thus liquidable, meaning measurable or computable or determinable, is not always easily decided, but it remains the test. The above wordings of the test and the above cases are noted with approval in the most recent case on the issue,[15] and the additional statement: ". . . As long as there is a genuine dispute about the amount that is due, the insurer should not have to pay interest until the amount has been determined, . . ." [16] requires that "genuine," not "dispute," be underlined to make clear that the Wisconsin rule is being followed, not altered.

---

[12] *Id.* at page 186.

[13] *Necedah Mfg. Co. v. Juneau County* (1932), 206 Wis. 316, 335, 237 N. W. 277, 240 N. W. 405.

[14] *California Wine Asso. v. Wisconsin Liquor Co.* (1963), 20 Wis. 2d 110, 132, 121 N. W. 2d 308.

[15] *Congress Bar & Restaurant v. Transamerica Ins. Co.* (1969), 42 Wis. 2d 56, 70, 71, 165 N. W. 2d 409.

[16] *Id.* at page 71.

What the *Congress Bar Case* repeated was a corollary test or guideline as to whether a damage claim in a contract case was liquidable in advance, by making relevant the degree of success of the objecting party in disputing the amount claimed. Where the claimant had been able to establish "just over half of its claim," this court in the *Congress Bar Case* denied the right to interest stressing that respondent's claim ". . . was for an amount substantially in excess of the amount finally determined to be due. . . ." [17] This is what had been done in reverse in an earlier case where the fact that an independent appraisal of plaintiff's demand for services and material fell only $178.31 short of plaintiff's claim of entitlement to $2,383.31 was held to be material and supportive of the awarding of prejudgment interest.[18] Thus the test remains whether the damage claim was liquidable or measurable or determinable in advance, but the variance between claim and court award can be used to determine whether the test was met.

This pragmatic shortcut to determining whether a particular contract claim was liquidable takes advantage of the fact that hindsight often is better than foresight. The pragmatic shortcut fits some situations, not all. If the contractor had prevailed on his claim to extra compensation for removing peat soil under footings at site "C," even full recovery would not erase the fact of genuine dispute on a close enough issue of fact and law. However, where, as here, full recovery was had on a particular claim for work done under the contract, and

---

[17] *Id.* at page 71.

[18] *Kleinschmidt v. Aluminum & Bronze Foundry* (1956), 274 Wis. 231, 236, 79 N. W. 2d 802, the court stating: "The . . . appraisal of $2,205 fell short of plaintiff's demand for services and material by only $178.31. It would seem probable, then, that there were fairly definite standards to which defendant might have resorted to determine what it justly owed, thus rendering the claim liquidable. . . ."

the record shows no more than putting the plaintiff to his proof, the *Laycock* requirement that the claim be liquidable in advance is met, and the *Kleinschmidt* factor of lack of variance between claim and award makes clear that it has been. Using such rearview mirror, it is clear that items 1, 3, 4, 5, 6, 9, 10 and 11 must be held to be claims liquidable in advance of trial on which prejudgment interest is to be allowed. As to items 2, 7, 8 and 12, we deal with final awards that are substantially less than the initial claims. As to these items, the *Congress Bar* holding makes it less than likely that these would or could be held to have been measurable or determinable in advance. Ordinarily, having rejected the dispute or difference of opinion between the parties as the dividing line between liquidable and nonliquidable claims, we would reverse on this point and return to the trial court to determine if these claims were liquidable. However, where $42,232.46 was awarded on twelve claims, we will act to disallow interest on four items and allow interest on eight items, modify the judgment, and finalize litigation on the issue here and now.

*By the Court.*—Judgment modified by inclusion of interest to plaintiff-appellant from date of demand to date of judgment on items 1, 3, 4, 5, 6, 9, 10 and 11. As so modified, the judgment is affirmed. Cause remanded for determination of interest and modification of judgment according to law and this opinion.

WILKIE, J., took no part.